UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

DOCKET NO. 21-CR-10294-RGS

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| v. | ) |
| | ) |
| THOMAS NEE, | ) |
|     Defendant | ) |

DEFENDANT'S SENTENCING MEMORANDUM

Now comes the defendant, Thomas Nee, by and through the undersigned counsel pursuant to 18 U.S.C. §3553(a) and the United States Sentencing Guidelines, and hereby moves this court to depart and/or deviate from the applicable guideline range as calculated by the court, and to impose a short sentence of probation on the defendant who has essentially already served a three-year term of probation. While such a sentence fits within the advisory guideline range as calculated by the Probation Department, and while such sentence is essentially the same as that recommended by the government,[1] grounds exist in this case that warrant a short term of probation for the sixty-seven year old defendant who dedicated his life to law enforcement, working for three years as a Capitol Police Officer, worked as a Campus Police Officer at UMass Boston, and then worked for thirty-five years as a Boston Police Officer. The defendant, who served for eighteen years as the President of the Boston Police Patrolmen's Association, and also served for approximately seven years as the President of the National Association of Police Officers (NAPO), is the father of nine children and the grandfather of fourteen grandchildren. For an individual with no criminal record, a brief term of probation is more than adequate

---

[1] The government has asked for "time served (one day)" likely assuming that the defendant was arrested like many of his peer officers. Defendant, Thomas Nee, pled guilty to an information and thus was never arrested or incarcerated. The defendant asks that no jail time be imposed, and that a short period of probation be imposed as the only real purpose of probation for a sixty-seven year old person with no criminal record would be to oversee any fines or restitution imposed.

deterrent value to meet the goals established within §3553(a), particularly in light of the collateral consequences already suffered by the defendant who will likely lose his means of providing for his family -- his pension -- now that he is a "sentenced" convicted felon.[2]

DEFENDANT'S BACKGROUND

As the court is aware from the defendant's Presentence Report, and from the multiple letters of support, the defendant is sixty-seven-years old. He grew up in a large family in public housing in South Boston. PSR ¶¶55-62. He is a 1974 graduate of Boston Technical High School. PSR ¶90. Following high school, the defendant worked a number of different jobs for a period of eight years, including working for a bag manufacturer in Brighton, making deliveries, working as a private security guard, and working for a concert promoter. During this time, the defendant took Civil Service Examinations with the goal of obtaining a job in law enforcement.

The defendant began his career in law enforcement in 1982 working with the Capitol Police in Alexandria, Virginia. PSR ¶94. In 1985, the defendant returned home to Boston to begin a career as a Boston Police Officer, only to learn that due to budgetary issues his job was no longer being filled. He then worked for approximately a year and a half as a police officer at UMass Boston before entering the Boston Police Academy in 1985. PSR ¶¶92-94.

As noted in the Presentence Report, and as documented in some of the letters of support, the defendant first worked as a Boston Police Officer in the C-11 District in Dorchester, one of the busiest and most diverse districts in the City of Boston. His former Captain, Robert Dunford, notes in his letter that "Tommy immediately showed himself to be a competent problem solver with a cool head. This was recognized by his fellow officers, who soon made him their Union

---

[2] Under DiMasi v. State Board of Retirement, 474 Mass. 194, 200-201 (2016), sentencing is the time the court concluded that "final conviction" occurs for forfeit of one's pension under Massachusetts General Laws c. 32, §15(4).

Representative. In short order, Tommy Nee would go on to lead the Boston Police Patrolmen's Union, where he remained for many years." As is obvious from the many letters of support from the defendant's former co-workers, the defendant earned the respect and trust of those he worked with by being a level-headed, fair, and caring police officer. The attached letter from George Juliano notes an instance where a family had their home broken into and had their Christmas presents stolen. The defendant and his partner "passed the hat at the station and they went out and replaced the gifts."

As noted in many of the letters of support, Thomas Nee served for eighteen years as the President of the Boston Police Patrolmen's Association, guiding the patrolmen's union through difficult times where homicides and shootings increased and there were searches for innovated solutions. The defendant, according to Captain Dunford, "saw the future of community policing, and worked with the Department to implement new solutions to old problems. He helped a generation of officers to understand that there were new and better possibilities to police work." (See, Letter of Robert P. Dunford.) During this time frame, the defendant also served for six years as the Vice President of the National Association of Police Officers (NAPO) and then went on to serve as President of NAPO for eight years (approximately 2007-2015) representing approximately 241,000 sworn law enforcement officers. In this capacity, the defendant was deeply involved in the passage of the Crime Bill and also testified before congressional committees on several occasions.

As noted in the letters of support, as well in the Presentence Report, the defendant is the father of nine children, ages 43 to 22, with his youngest son being non-verbal autistic. PSR ¶¶ 68-77. Despite the burden of work involved in being both the President of the Boston Police Patrolmen's Association and the President of the National Association of Police Officers, the

defendant was and remains deeply committed to his children. The hours the defendant put into his position as Union President, however, were overwhelming, and the sacrifice entailed with that position did take a toll on the defendant's family life and his marriage. The undersigned counsel can attest to hundreds of incidents requiring responses in the middle of the night, on weekends and on holidays.

From a personal standpoint, the defendant went through a difficult period of emotional strain following difficulties his oldest son got into while in high school which later culminated in his son committing suicide. PSR ¶70. This incident ultimately culminated in the defendant attending a two-week in-patient program at McLean Hospital designed specifically for law enforcement officers, active duty personnel and emergency responders (LEADER Program). PSR ¶83. As noted in a touching letter from Attorney William Johnson, the defendant was caring and compassionate at a later date when Attorney Johnson lost one of his sons to suicide. Another more recent difficult fallout in the defendant's family is one of his daughter's inabilities to communicate with her father as the result of his "convicted felon" status due to her U.S. military security clearance. PSR ¶71.

In the late fall of 2014, the defendant was defeated in a re-election effort to retain his position as the President of the Boston Police Patrolmen's Association. At this point, after having been off the streets for eighteen years as Union President and several years prior to that as Union Vice President, the defendant had no job to return to as he had been off of the streets for over two decades and was now fifty-seven years old. Despite making several requests for placement, the defendant, who had a strained relationship with the then police commissioner as a result of years of advocating for the union, was ultimately given the option of working at the front desk of headquarters or at the Evidence Control Unit (ECU), both of which positions were

4

then under secret investigation by the Boston Police Anti-Corruption Division. The defendant opted for the Evidence Control Unit as it was hidden from public sight and posed less public humiliation for the recently defeated, long term union president.

## THE OFFENSE

As set forth in the Presentence Report, in approximately 2011 the Boston Police evidence warehouse ran out of space to store new evidence, and began using "purge overtime" to allow officers to dispose of old, unneeded evidence to make room for new evidence. The purge shift was to run from 4:00 p.m. to 8:00 p.m. generally on the nights of Monday through Thursday. PSR ¶12. The decision to split this four hour overtime block into an "early shift" and a "late shift" were created by two (then) Boston Police Sergeants who have not been charged with this offense, and currently are working in the rank of Deputy Superintendent and Lieutenant Detective with the Boston Police Department. The masterminds of this scheme, who have not been charged, will not lose their pensions upon their retirement. At this time, the culture of the Boston Police Department was that these supervisors, without hesitation, repeatedly signed overtime slips for patrol officers they supervised knowing that the shifts were being split. As the court is aware from the Presentence Report, from this fact pattern, nine police officers have pled guilty and are awaiting sentencing, one (Captain Richard Evans) was convicted after trial,[3] and four were acquitted after trial including Lieutenant Tim Torigian, Sergeant Robert Twitchell, Officer Henry Doherty and Officer Kendra Conway. PSR ¶5, pgs. 3-6 (Defendant Nee testified for the government in the prosecution of the first four defendants, and met with the government multiple times before both trials.) In addition to those who were not charged, including those who set up the "split – shift," and the four officers who were acquitted, the government

---

[3] The defendant is mindful that his sentencing judge oversaw the trial of Captain Evans.

immunized multiple officers in their effort to build their case against the defendants. Specifically, the undersigned counsel represented at least eight Boston patrol officers who were given proffers or who were immunized and were not charged. Although this is not a defense to the charges, there was considerable unfairness in the charging decisions made in this case, and as such, not everyone is being punished for collective wrongdoing.

The defendant arrived at Evidence Control Unit in the winter of 2015 and remained there for several years, during which he repeatedly requested a transfer. The work itself, as well as the overtime, were foreign to the defendant as were the updated department computers. While not running from his culpability or responsibility, the defendant was placed into a location he did not want to be, where it had been accepted for years that officers would work part of the overtime shift yet fill out their overtime slips stating that they worked the full four hours. This practice was condoned by sergeants, lieutenant and captains. As the defendant testified at the trial of four of his co-workers, he ultimately went along with this because it financially benefitted him. Upon receipt of a target letter, the defendant promptly accepted responsibility for his actions.

SENTENCING FRAME WORK

As the court is well aware, in *United States* v. *Booker*, 543 U.S. 220, 226-227, 125 S.Ct. 738 (2005), the Supreme Court held that the mandatory Sentencing Guidelines system violated the Sixth Amendment, and thus as a remedial measure the guidelines remain "effectively advisory." Although the sentencing commissions "recommendation of a sentencing range will 'reflect a rough approximation of the sentence that might achieve §3553(a)'s objective,' *Rita* v. *United States*, 551 U.S. 338, 350, 127 S.Ct. 2456, 2465 (2007)," *Kimbrough* v. *United States*, 552 U.S. 85, 89, 128 S.Ct. 558, 562-563 (2007), the guidelines are treated as only the "starting point and the initial benchmark" for calculating the appropriate sentence. *Gall* v. *United States*,

552 U.S. 38, 49, 128 S.Ct. 586 (2007), *Rita* v. *United States*, 551 U.S. at 347, 350, 127 S.Ct. 2464-2465 (2007). "The guidelines are not the only consideration, however. Accordingly, after giving both parties an opportunity to argue for whatever sentence they deem appropriate, the district court judge should then consider all of the §3553(a) factors to determine whether they support the sentence requested by a party. In so doing, <u>he may not presume that the Guidelines range is reasonable</u> [citation omitted]. He must make an individualized assessment based upon the facts presented." *Gall* v. *United States*, 552 U.S. 28, 49-50, 128 S.Ct. 586, 596-597 (2007).

"In the course of [the sentencing] assessment, the court would have to ask whether such a sentence, if imposed, would encourage 'respect for the law,' 18 U.S.C. §3553(a)(2)(A); 'provide just punishment for the offense,' *id*.; and 'afford adequate,' but not excessive, deterrents, *id*. §3553(a)(2)(B). Ultimately, the court (depending on how it views the case) could ground a variant sentence in the parsimony principle rather than in §3553(a)(6) alone." *United States* v. *Rodriguez*, 527 F.3d 221, 228 (1st Cir. 2008), citing *Kimbrough* v. *United States*, 552 U.S. 111, 128 S.Ct. at 575. In crafting such a sentence, the court must remain vigilant and mindful that §3553(a)'s over arching instruction is to "impose a sentence sufficient, <u>but not greater than necessary</u>," to accomplish the sentencing goals advanced in §3553(a)(2).

As the court is mindful, the second factor required under §3553(a) requires consideration of the following:

"the need for the sentence imposed -

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." §3553(a)(2)."

## SENTENCING RECOMMENDATION

Looking at the defendant, his background, the punishment he has already received, the devastating effect any period of incarceration would have on the defendant's immediate and extended family, the fact the defendant poses no risk of re-offending, and the fact that he is no danger to society, a sentence of probation is considerably more than necessary to meet the purposes of §3553(a) and abides by its directive to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing described in the second factor. See *Gall* v. *United States*, supra at 50, 128 S.Ct. at 597.

As noted in the Presentence Report, the defendant is sixty-seven years old. He has gone through considerable health difficulties over the recent years, having multiple surgeries to remove skin cancer on his face, eyes and ears, he has undergone a right hip replacement in January of 2024, and undergone a difficult situation with his right quad muscle atrophying making walking, getting up from a chair, and other movements painful. He is deeply engaged in physical therapy and constantly in pain.

The defendant has no criminal record. He served in three police departments without ever being reprimanded or disciplined. For almost half of his career, the defendant was the President of a powerful city union in Boston, as well as the President of the National Association of Police Officers where he represented and advocated for approximately 241,000 law enforcement officers. He is someone who truly has experienced a fall from grace going from being a powerful person to being a convicted felon. This has not, however, altered his constant attitude of giving. For the last several years, the defendant and his wife have been deeply involved in feeding 1,500 meals to others at Thanksgiving and to 900 people at Christmas

through the South Boston Collaborative. The attached letters of support all speak of the respect and reverence his former co-workers and supervisors had for him. The defendant's former Vice President of the Union, Ronald MacGillivray, describes the defendant as "a giver" in every aspect of his life. Robert Boyle, a former Union Secretary from 1996 to 2002, describes how the defendant paid union utility bills out of his own pocket when the BPPA was in financial difficulty, and almost all of the letters attest to the strain that the union position put on his family by way of lost family events and lost family time.

The randomness by which the government chose to prosecute or similarly, to not prosecute individuals raises significant questions regarding the fairness of any punishment. Multiple employees from the Evidence Control Unit were never charged, including the masterminds of the split-shift system, while myriad others were immunized from prosecution. To highlight the unfairness, four of the individuals who were charged have since been acquitted by a jury, and to the extent the government may seek to combine any "financial loss" amount attributable to those four individuals seems manifestly unfair if that "loss" is attributable to the defendant as part of the conspiracy. Although the defendant quibbles with the loss figures as calculated by probation, and notes that he himself only obtained something in the area of $15,000 to $16,000 in ill-gotten proceeds.

## LIKELY FORFEITURE OF PENSION

Upon his sentencing in this case, the defendant is extremely likely to be the subject of the forfeiture of his pension, a particularly harsh penalty for someone simply trying to keep a roof over their head, food on their table, and support their family. Specifically, Mass. Gen. Laws c. 32, §15(4) states the following:

> (4) *Forfeiture of Pension Upon Misconduct.* -- In no event shall any member after final conviction of a criminal offense involving

> violation of the laws applicable to his office or position, be entitled to receive a retirement allowance under the provisions of section one to twenty-eight, inclusive, nor shall any beneficiary be entitled to receive any benefits under such provisions on account of such member. . . ."

In the current case, the offense happened at least seven years ago, the defendant pled guilty to this offense almost three years ago to the day, and has been compliant with all of his probationary conditions. The defendant is not a threat to society, and he is not likely to re-offend. In this case, the disgrace of being a convicted felon, the unemployability that comes with being a convicted felon, and the passage of seven years since the defendant last worked as a Boston Police Officer should give the court solace that the defendant will not re-offend.

For all of the foregoing reasons, the defendant asks this court to sentence him to a term of probation in this matter and a nominal fine given the defendant's clear inability to pay any type of fine.

## CONCLUSION

For all the foregoing reasons, as well as the additional grounds set forth in letters of support, the defendant moves that this court show leniency and to impose a brief sentence of probation as sought by the government.

Respectfully submitted,
Defendant,
THOMAS NEE,
By his Attorney,

*/s/ Kenneth H. Anderson, Esq.*
Kenneth H. Anderson, Esq.
B.B.O. # 556844
ANDERSON, GOLDMAN, TOBIN,
 & PASCIUCCO, L.L.P.
50 Redfield Street
Boston, MA  02122
(617) 265-3900
DATED:  July 8, 2024                                                          kanderson@andersongoldman.com

## CERTIFICATE OF SERVICE

I, Kenneth H. Anderson, Esq., attorney for the defendant hereby certify that I served **DEFENDANT'S SENTENCING MEMORANDUM,** filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing on July 8, 2024.

*/s/ Kenneth H. Anderson, Esq.*
Kenneth H. Anderson, Esq.
